******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ANGEL L. ORTIZ *v.* COMMISSIONER
OF CORRECTION
(AC 37373)

Sheldon, Keller and Mullins, Js.

*Argued March 15—officially released July 5, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Bright, J.)

*W. Theodore Koch III*, assigned counsel, for the appellant (petitioner).

*Timothy J. Sugrue*, assistant state's attorney, with
whom, on the brief were *Gail P. Hardy*, state's attorney,
and *Jo Anne Sulik*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

KELLER, J. Following a grant of certification to appeal, the petitioner, Angel L. Ortiz, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner claims that the habeas court erroneously concluded that he failed to demonstrate his actual innocence. We affirm the judgment of the habeas court.

The following facts and procedural history underlie this appeal. Following a joint jury trial, the petitioner and a codefendant, Julio Diaz-Marrero, were each found guilty of one count of the following crimes: capital felony in violation of General Statutes (Rev. to 1994) § 53a-54b (8) and General Statutes § 53a-8; two counts of capital felony in violation of General Statutes (Rev. to 1994) § 53a-54b (5) and § 53a-8; two counts of murder in violation of General Statutes (Rev. to 1994) § 53a-54a (a) and § 53a-8; two counts of felony murder in violation of General Statutes § 53a-54c; one count of conspiracy to commit murder in violation of General Statutes (Rev. to 1994) § 53a-54a (a) and General Statutes § 53a-48 (a); two counts of kidnapping in the first degree in violation of General Statutes §§ 53a-92 (a) (2) (A), (B) and (C) and 53a-8; one count of robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4) and 53a-8; one count of conspiracy to commit kidnapping in the first degree in violation of §§ 53a-92 (a) (2) (A), (B) and (C) and 53a-48 (a); and one count of conspiracy to commit robbery in the first degree in violation of §§ 53a-134 (a) (4) and 53a-48 (a). The trial court sentenced the petitioner and Diaz-Marrero to total effective sentences of life imprisonment without the possibility of release. Pursuant to General Statutes § 51-199 (b) (3), the petitioner and Diaz-Marrero appealed the judgments of conviction directly to our Supreme Court. Our Supreme Court reversed the judgments in part, remanding the case to the trial court with direction to combine the three conspiracy convictions and to vacate the sentences for two of the conspiracy convictions. The court affirmed the judgments in all other respects. *State* v. *Ortiz*, 252 Conn. 533, 747 A.2d 487 (2000). In addition to rejecting other claims raised by the petitioner, our Supreme Court rejected the petitioner's claim that "the jury's finding of guilt is a miscarriage of justice, reached against the manifest weight of the evidence, and that the court improperly refused to grant [the petitioner] a new trial." Id., 570.

Our Supreme Court set forth the facts that the jury reasonably could have found, as follows: "In the late hours of July 27, 1994, and into the early hours of July 28, 1994, the [petitioner and Diaz-Marrero] carried out a plan to kidnap, rob and kill Hector Alvarado (Alvarado), and his wife Migdalia Bermudez (Bermudez). The victims were abducted and robbed in Hartford, and then taken to Rocky Hill where they were executed by Diaz-

Marrero with a twelve gauge shotgun. Alvarado was shot in the head and he died instantly. Bermudez was shot in the back, hips and buttocks, she was left for dead in the travel portion of the road, and she died approximately five hours later at Hartford Hospital.

"Alvarado was a known drug dealer, who conducted an illegal drug selling operation, with the assistance of [the petitioner], at a residential apartment building located at 66 Webster Street in Hartford. [The petitioner] was Alvarado's brother-in-law, and he lived at 66 Webster Street. Alvarado had requested that [the petitioner] build a secure box in which Alvarado could store his drugs and money. Accordingly, [the petitioner] built the secure box and Alvarado kept it in the basement of his home at 109 Adelaide Street in Hartford.

"Diaz-Marrero had come to Hartford from Caguas, Puerto Rico, a few weeks prior to the murders. He stayed for approximately one week at 66 Webster Street with Wilson Rodriguez, who was another resident of the building. At trial, Wilson Rodriguez testified that on July 26, 1994, shortly after Diaz-Marrero had stopped staying with him, his apartment was burglarized and two shotguns and a rifle were stolen. Before the jury, Wilson Rodriguez identified the guns that were found near the crime scene as those that had been stolen [from his apartment].

"On Wednesday, July 27, 1994, at 8:30 p.m. and again at 9:30 p.m., Diaz-Marrero and [the petitioner] went to the home of Alvarado's mother, Maria Cruz Rodriguez (Rodriguez), looking for Alvarado. Later that night, a van driven by [the petitioner] stopped on Park Street in Hartford and Diaz-Marrero, who was in the van, asked Ramon Caraballo if he wanted to buy some drugs. Caraballo knew Diaz-Marrero as 'Tongo' and testified that they occasionally had used drugs together. Caraballo got into the van and sat in the front seat next to [the petitioner].

"Another resident of 66 Webster Street, Jesus Roman, who also knew Diaz-Marrero as 'Tongo,' testified about the events that occurred on the evening of the murders. According to Roman's testimony, at 11 p.m., Tongo pulled up in a van and asked Roman if Alvarado was around and if he had drugs. Roman told him that Alvarado was around and that he had drugs, and Roman offered to buy the drugs for Diaz-Marrero. Diaz-Marrero declined Roman's offer, saying that he wanted to deal with Alvarado directly, and he asked Roman to tell Alvarado that Diaz-Marrero would be waiting for him on Campfield Avenue.

"Roman conveyed Diaz-Marrero's message to Alvarado and offered to go along. The two men and Bermudez then drove in Alvarado's car to Campfield Avenue and parked behind the van. Diaz-Marrero exited the van, walked toward Alvarado's car and asked him to

step out of the car so they could speak alone. Alvarado and Diaz-Marrero walked to the front of the van and Roman and Bermudez exited the car. As Alvarado returned to his car, Diaz-Marrero, holding a shotgun, walked toward Alvarado, Bermudez and Roman. Diaz-Marrero took Bermudez by the arm and fired the shotgun into the sidewalk. Just as Diaz-Marrero fired the shotgun into the sidewalk, Caraballo, who was attempting to leave the scene and had just opened the door of the van and placed a foot on the ground, was struck in the throat by a ricocheting shotgun slug or pellet. Roman saw Diaz-Marrero take Bermudez, who was crying, and put her into the van. Still armed, Diaz-Marrero returned for Alvarado, who took money out of his pocket and offered it to him. Roman then saw Alvarado return the money to his pocket and watched Diaz-Marrero point the shotgun at Alvarado, take him by the arm and lead him into the van. Roman watched the van drive away, turning left onto Adelaide Street.

"Caraballo, who had reentered the van after being shot, testified that although he was injured and bleeding, he was also alert and conscious. He claimed that Diaz-Marrero had said '[l]et's go to the man's house.' The van stopped a short distance later in front of an apartment building and Diaz-Marrero, still armed with the shotgun, took Alvarado out of the van and into the apartment building. Caraballo, [the petitioner] and Bermudez stayed in the van. Several minutes later, Diaz-Marrero and Alvarado returned to the van. Diaz-Marrero carried a paper bag, which he then handed to [the petitioner]. Diaz-Marrero then ordered [the petitioner] to drive off.

"The van traveled through some traffic lights and then entered a highway. After the van had traveled a short distance, it stopped near the side of the road. Diaz-Marrero exited the van and ordered the victims to get out, and they complied. Caraballo and [the petitioner] remained in the van. Several shots were then fired. Diaz-Marrero returned to the van without the victims and said to [the petitioner], '[l]et's get out of here.' A few minutes later, Diaz-Marrero threw the shotguns out the passenger side window of the van. The van then returned to Hartford. Caraballo was let out on Park Street.

"On July 29, 1994, a Rocky Hill teenager discovered a shotgun in the grass by the side of Route 3. The police were summoned, they seized the shotgun, and they then discovered and seized the sawed-off stock and a second shotgun that was found nearby. Both shotguns were twelve gauge: one was a sawed-off ERA double-barreled shotgun, and the other was a High Standard single-barreled shotgun. Several discharged shells found at the scene were determined to be Winchester Super X double-O buck shotgun shells fired from the High Standard shotgun. Bermudez had been shot with both

double-O buckshot and birdshot. The recovered ammunition components were consistent with the ammunition stolen from Wilson Rodriguez' apartment.

"Aida Bermudez, [Bermudez' sister], testified that at Bermudez' wake on July 31, 1994, [the petitioner] told her certain details about the murders. She testified that [the petitioner] told her the following information: that three men in a van had kidnapped and killed the victims; that the victims had been picked up on Webster Street and taken to Campfield Avenue where a gun was fired into the sidewalk and pointed at Alvarado, who was then forced into the van; that Bermudez was not an intended victim but was nevertheless forced into the van; that the victims were taken to their home and forced into the basement, where the men believed that drugs and money were stored in a wooden box; that drugs and money were stolen; that the victims were taken in the van to Rocky Hill; and that Bermudez was shot when she tried to flee her abductors.

"Diaz-Marrero left Connecticut shortly after the murders. A police officer from Caguas, Puerto Rico, testified that he saw Diaz-Marrero in Caguas on August 1, 1994. [The petitioner] also left Connecticut and was arrested in New Jersey on August 31, 1995." (Footnote omitted.) Id., 537–41.

By way of an amended petition for a writ of habeas corpus, dated August 27, 2012, the petitioner sought habeas corpus relief on the ground that newly discovered evidence demonstrated his actual innocence. He requested that the court grant his petition, vacate his convictions, and release him from custody. In his one count petition, the petitioner alleged in relevant part: "The victims, Hector Alvarado and Migdalia Bermudez, were abducted at gunpoint in Hartford, taken to their residence at gunpoint and robbed there of narcotics, money and a television, then driven to Rocky Hill where they were shot to death. . . . The state's evidence at trial indicated that [Diaz-Marrero] kidnapped, robbed and shot the victims, while [the] petitioner was the silently complicit driver. . . . In fact, [the] petitioner had absolutely no role in the crime. . . . In fact, [Diaz-Marrero] was the driver. Additionally, [Diaz-Marrero] participated in the abduction and robbery of the victims, in collaboration with two of the state's critical witnesses: Ramon Caraballo and Jesus Roman. . . . In fact, Ramon Caraballo instigated the kidnapping, and he and Jesus Roman were the shooters."

Also, the petitioner alleged: "[The petitioner] is actually innocent of all crimes of which he was convicted. . . . The newly discovered evidence to support this claim is the February 22, 2007 testimony of [Diaz-Marrero] in his [trial on his] own petition for a writ of habeas corpus; [*Marrero* v. *Warden*, Superior Court, judicial district of New Haven, Docket No. CV-99-0425076 (January 24, 2008), appeal dismissed, 114 Conn.

App. 901, 969 A.2d 880 (2009)]; as well as [Diaz-Marrero's] anticipated testimony at trial in the instant petition. . . . Additional anticipated petitioner's evidence will corroborate [Diaz-Marrero]." The respondent, the Commissioner of Correction, left the petitioner to his proof.

The centerpiece of the evidence presented by the petitioner at the habeas trial was the testimony of Diaz-Marrero. Because it is critical to the claim raised in this appeal, we will set forth the habeas court's accurate and detailed summary of that testimony: "Diaz-Marrero testified . . . [that] he came to Hartford, Connecticut, from Puerto Rico in July, 1994, and was staying with Wilson Rodriguez at 66 Webster Street. He left Puerto Rico because he had legal issues there. He was a drug addict and was using every day. He bought his drugs on Park Street from Alvarado, Roman and others.

"He also met Caraballo on Park Street. He actually knew Caraballo from when they were in Puerto Rico because they went to the same school. Caraballo and Diaz-Marrero began using drugs together. Caraballo came over to Wilson Rodriguez' apartment a couple of times and saw two shotguns and a rifle that Rodriguez owned.

"After living with Wilson Rodriguez for a week, Diaz-Marrero moved in with Caraballo and Carmen Alcaraz on Carpenter Street. Diaz-Marrero and Caraballo then decided to steal Wilson Rodriguez' guns and jewelry. They went back to Rodriguez' residence and stole the three guns and some rings and chains, including a gold ring with an 'R' on it. Caraballo kept and wore that ring. The guns were initially placed in Caraballo's apartment on Carpenter Street, although Diaz-Marrero took one of the shotguns.

"One or two nights after stealing them, Caraballo, Diaz-Marrero and Roman used the guns to abduct Alvarado and Bermudez. The crimes started as an attempt by the three to sell the stolen guns and jewelry to Alvarado. Diaz-Marrero drove a van in which Caraballo was a passenger to a spot where Roman was waiting outside with Alvarado and Bermudez. Roman was called over to the van where he was given at least one of the weapons. Roman, Alvarado and Bermudez then got in a car and followed the van down Campfield Avenue, where the car parked behind the van.

"Everyone got out of the car and van. Roman gave Diaz-Marrero a rifle, which he put in the van. As Alvarado approached the van, Caraballo changed the plans and decided to rob him. He ordered Alvarado into the van. Alvarado resisted and grabbed for the shotgun Caraballo was holding. As they struggled, the shotgun discharged and Caraballo was hit in the neck. Alvarado and Bermudez were then restrained and put in the van. During the struggle, the ring with the 'R' fell off of

Caraballo's finger to the ground.

"Diaz-Marrero got into the driver's seat and drove the van to Alvarado's apartment. Roman drove Alvarado's car there and parked behind the van. Diaz-Marrero took Alvarado into the apartment and told him to get money and drugs. Alvarado grabbed a box with money and drugs and gave it to Diaz-Marrero. Diaz-Marrero also took a television, which Roman placed in the car. Diaz-Marrero got back into the van with Alvarado, where Caraballo and Bermudez were waiting. Caraballo then communicated nonverbally to Diaz-Marrero that they needed to kill Alvarado because if they took Caraballo to the hospital and released Alvarado, Alvarado would know where to find Caraballo. Diaz-Marrero agreed because he was on drugs and did not want Caraballo to die.

"Diaz-Marrero drove the van onto Interstate 91 heading south. Roman followed in Alvarado's car. They then exited the highway and made a U-turn off an entrance ramp and parked. Roman parked behind the van. Alvarado and Bermudez were removed from the van. Caraballo shot Alvarado in the head from behind. Roman shot Bermudez three times.

"Diaz-Marrero and Caraballo then left in the van. Roman left in Alvarado's car. Caraballo wiped the guns and threw them from the van. Diaz-Marrero then drove the van to Park Street to return it to its owner. Caraballo gave the owner some drugs. Caraballo and Diaz-Marrero then got into Alvarado's car with Roman and were driven to Caraballo's apartment. Alcaraz then took Caraballo to the hospital. She returned in the morning and told Diaz-Marrero to leave. He took a bus to New York City before returning to Puerto Rico, where he was later detained and extradited to Connecticut.

"Diaz-Marrero first learned that [the petitioner] had been arrested for the murders about a year after Diaz-Marrero was extradited to Connecticut. He saw [the petitioner] for the first time when he appeared in court. He told his lawyers that he did not know [the petitioner]."

In an effort to corroborate the testimony of Diaz-Marrero, the petitioner presented testimony from Diaz-Marrero's trial counsel, Attorney Barry A. Butler and Attorney Martin Zeldis; Diaz-Marrero's counsel from his 2007 habeas corpus proceeding, Attorney Walter Bansley; as well as Dean Holliday, an acquaintance of the petitioner and Diaz-Marrero. In relevant part, Butler testified that, at the time of the criminal trial of the petitioner and Diaz-Marrero, Diaz-Marrero made it clear to him and Zeldis that he did not know the petitioner and saw him for the first time in court. Further, Butler testified that, contrary to Diaz-Marrero's testimony in the present proceeding, in which he admitted being present at the events at issue, he denied having *any*

involvement in the crimes. Consistent with Butler's testimony, Zeldis testified that, at the time of the criminal trial, Diaz-Marrero told him that the first time that he ever saw the petitioner was at the trial.

Bansley testified in relevant part that when he represented Diaz-Marrero in connection with a habeas corpus petition brought by Diaz-Marrero, in which he sought a new trial, he stated that "[the petitioner] was not involved in this, and he seemed pretty adamant that he wanted to have that come to light." According to Bansley, Diaz-Marrero "was consistent every time we met when we would discuss the facts of the crime that he wasn't the shooter, that he was the driver. He was equally consistent every time I met with him that [the petitioner] was not present and he had never met [the petitioner] until the first time they were in court together." Bansley testified that, although he had advised Diaz-Marrero that admitting his participation in the murders, as he did in the present proceeding, "would not help him and would actually seal his fate," Diaz-Marrero "was adamant about going forward and wanting to make it known that he was not the shooter and that [the petitioner] was innocent." After Diaz-Marrero testified at his own habeas trial, Bansley provided a transcript of his testimony to the petitioner.

The habeas court aptly summarized Holliday's testimony: "Dean Holliday testified that he knew [the petitioner] from when they both lived in Hartford and while they were both in prison. He further testified to meeting Diaz-Marrero in prison. Diaz-Marrero showed him the transcript from his own habeas trial [in 2007] at which he testified to the same version of events as he did in this matter. Holliday also testified that [the petitioner] has the same hair color today as he had in Hartford in 1994. It is and was black. He also never saw [the petitioner] drive a car."

Finally, at the habeas trial, the petitioner testified that, on the night of the murders, he was at Rodriguez' house with his wife until 2:30 a.m., and that he did not play any role in the murders. He testified that Alvarado, who was his wife's brother, was like a son to him. He testified that he enjoyed a good relationship with Bermudez, and that over the years she had provided assistance to both him and his wife. He testified that, contrary to Romero's testimony at his criminal trial, he never had a conversation with Romero in which he stated that, if he was apprehended for the crimes, he would "take" several others "down with [him]."Also, the petitioner testified that Aida Bermudez' testimony, that he had implicated himself in the murders during a conversation at her sister's wake, was "a lie."

In a thorough memorandum of decision, the habeas court denied the amended petition for a writ of habeas corpus. In its findings of fact, the court discussed the evidence presented at the petitioner's criminal trial, as

well as the facts that the jury reasonably could have found. In relevant part, the court observed that the state's case against the petitioner was based primarily on the testimony of several witnesses, including Caraballo, Roman, Maria Cruz Rodriguez, Aida Bermudez, and Angel Romero. During his testimony at the petitioner's criminal trial, Caraballo discussed the events that took place on the night of the murders. Caraballo testified that he was present during the events at issue, and he identified the petitioner as the driver of the van used to abduct Alvarado and Bermudez. Although Roman did not implicate the petitioner in the crimes, he testified in relevant part that he arranged the drug transaction between Diaz-Marrero and Alvarado, was present when Diaz-Marrero and Alvarado met on Campfield Avenue, and observed Diaz-Marrero fire a shot into the sidewalk before taking the victims into the van and driving away. Maria Cruz Rodriguez, Alvarado's mother, testified at trial that, after Diaz-Marrero's arrest, she went to the police station to inquire with regard to the investigation. She saw a photograph of Diaz-Marrero, and identified him as having been with the petitioner on the night of the murders. She testified that, hours before the kidnappings and murders, Diaz-Marrero, accompanied by the petitioner, asked her if she knew Alvarado's whereabouts. Aida Bermudez, the sister of Migdalia Bermudez, testified in relevant part that, at her sister's wake, the petitioner told her details of how the victims were abducted and killed. Angel Romero, a son-in-law of Maria Cruz Rodriguez, testified that several days following the murders, the petitioner told him: " 'If I get arrested for this, I'm not going down alone. I'm taking a lot of people with me.' " Neither the petitioner nor Diaz-Marrero testified at the consolidated criminal trial.

The habeas court found the following facts: "Based on a review of the underlying criminal trial proceedings, it is clear that the petitioner was convicted because the jury chose to believe the state's witnesses. There was no physical evidence that connected the petitioner to the crimes. Consequently, the jury must have relied upon Caraballo's identification of the petitioner as the driver, along with (1) Rodriguez' testimony that [the petitioner] and Diaz-Marrero were looking for Alvarado hours before he was killed; (2) Aida Bermudez' testimony that the petitioner knew the details of the crimes; and (3) Angel Romero's testimony that [the petitioner] told him he would take others with him if he was arrested. The defense had arguments as to why the jury should reject all of this testimony, but those arguments were unsuccessful."

In its findings, the habeas court went on to state: "The petitioner argues that the court should credit Diaz-Marrero's testimony because it was 'measured, deliberate and unflinching.' He also claims that Diaz-Marrero's version of events makes much more sense than those

of Caraballo and Roman. For example, according to the petitioner, Diaz-Marrero's explanation of how Caraballo got shot is much more logical than the state's ricochet theory, which, in and of itself, suffered from inconsistencies between Caraballo and Roman. Similarly, the fact that [the petitioner] was not present would explain how Caraballo and Roman could give disparate descriptions of the driver, neither of which matched [the petitioner].

"Furthermore, the testimony of Caraballo and Roman leave troubling questions unanswered. First, the state never explained why Alvarado and Bermudez never asked [the petitioner], their close relative, why he was doing this. Nor did they beg for their lives. Certainly, Bermudez had the opportunity to do so when, according to Caraballo, Diaz-Marrero took Alvarado into his house to rob it. By doing so, Diaz-Marrero left Bermudez in the van with [the petitioner] and Caraballo. Bermudez would have had an opportunity to talk directly to [the petitioner] while not being threatened by Diaz-Marrero. Yet, Caraballo never testified about any such conversation.

"Second, one has to question why Diaz-Marrero would release Caraballo upon returning to Hartford when Caraballo was the only eyewitness to the murders, other than Diaz-Marrero's coconspirator, [the petitioner]. Having just brutally killed two individuals he supposedly just met, it is reasonable to expect that Diaz-Marrero would be willing to kill a third rather than release a witness who could connect him directly to the killings. It make more sense that Diaz-Marrero would assist Caraballo in getting medical treatment if he was one of his coconspirators in the murders, as Diaz-Marrero claims [in his present testimony].

"The court recognizes the logic in these arguments. And these issues do raise questions in the court's mind about the guilt of the petitioner. Nevertheless, there are also reasons to doubt Diaz-Marrero's credibility and his version of events. First, Diaz-Marrero admitted that he hopes he will receive a new trial if the court accepts his version of the crimes. He believes that if his version is accepted, then his conviction will be thrown out because it was based on the perjured testimony of Caraballo and Roman. While the court sees no logical merit to such a position, it was clear to the court that Diaz-Marrero's hope is sincere. Thus, his testimony in this matter is not motivated solely by a desire to clear his conscience and free an innocent man, but also to help himself.

"Similarly, Diaz-Marrero now seeks to minimize his involvement in the murders. He was convicted of actually shooting Alvarado and Bermudez. He now claims that he was only the driver of the van. While his legal culpability is the same regardless of his role in the murders, Diaz-Marrero appeared to the court to believe

himself less responsible due to his alleged lesser role. Once again, Diaz-Marrero's testimony seemed to be as much for his perceived own benefit as for that of the petitioner.

"Diaz-Marrero's testimony also leaves questions unanswered. For example, how exactly did Caraballo communicate nonverbally that Alvarado and Bermudez needed to be killed and the reason why? Diaz-Marrero failed to provide any details explaining this feat, and the court has difficulty envisioning how such a thorough message (particularly as to why Caraballo wanted them dead) would be conveyed without words under the circumstances. Similarly, Diaz-Marrero did not explain how Caraballo managed to hold a shotgun and shoot Alvarado in the back of the head while Caraballo was suffering from a serious wound to his neck. In fact, the court finds it incongruous that Caraballo would not leave the van to rob Alvarado's house, but would get out of the car to kill Alvarado. Certainly, it would have been easier for Roman, who, according to Diaz-Marrero, was willing to shoot Bermudez three times, to also kill Alvarado. The same would also be true for Diaz-Marrero, who admitted [that] he was willing to participate in the plan to kill the victims.

"A further problem with Diaz-Marrero's testimony is that there is no corroboration for it. There is no physical evidence that supports it, and no other witness was offered that buttressed any of the events as described by Diaz-Marrero. Carmen Alcaraz did not testify to substantiate Diaz-Marrero's claim that he and Roman drove Caraballo to her and that she told Diaz-Marrero to leave her apartment the morning after the murders [occurred]. The owner of the van did not testify. The van was never found. Wilson Rodriguez did not testify to identify the 'R' ring as belonging to him and has having been stolen with his guns. Alvarado's car, which presumably would have had Caraballo's blood in it given Diaz-Marrero's version of events, was never found or tested. Roman and Caraballo did not come to court and recant their testimonies.[1]" (Footnote in original.)

Also, the court found that the petitioner's testimony was neither credible nor persuasive. The court stated: "The court ascribes little weight to the petitioner's testimony. His alibi is uncorroborated. His wife, having passed away, was not able to substantiate his testimony. While she testified briefly about [an alibi defense] at trial, her testimony was stricken and she was never subject to cross-examination on the subject. Rodriguez' testimony at trial also undermined the alibi claim, and, as far as the court knows, Rodriguez has never strayed from that testimony. As to Aida Bermudez and Romero, it is hardly surprising that a man claiming his innocence would label as liars the two people who testified to incriminating statements made by him. There is no evidence that either witness has ever retreated from their

testimony, and the court is not prepared to disregard such testimony based solely on the petitioner's denials.[2]" (Footnote in original.)

After setting forth its findings of fact, the court went on to apply governing legal principles to its findings. At the outset, the court set forth the two-part test for obtaining habeas relief on the basis of a freestanding claim of actual innocence articulated in *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 791–92, 700 A.2d 1108 (1997). The court considered whether the evidence presented by the petitioner to demonstrate his actual innocence—Diaz-Marrero's testimony—was newly discovered evidence as required by precedent of this court.[3] It is not in dispute that, at the time of the petitioner's criminal trial, Diaz-Marrero asserted his fifth amendment privilege and did not testify. The court, following the approach set forth in *United States* v. *Montilla-Rivera*, 115 F.3d 1060, 1065–66 (1st Cir. 1997), concluded that the evidence was newly discovered evidence because it was not known or was unavailable to the petitioner at the time of his criminal trial.[4]

The court proceeded to consider whether, under the legal standard set forth in *Miller*, the petitioner satisfied his burden of demonstrating his actual innocence. The court, repeatedly invoking the standard in *Miller* during its analysis, concluded that, at the habeas trial, the petitioner failed to demonstrate by clear and convincing evidence that he was actually innocent of the crimes of which he was convicted. The court correctly observed that "[t]he petitioner's claim relies first and foremost on the court's acceptance of Diaz-Marrero's testimony as credible. It is virtually the only affirmative evidence offered of the petitioner's innocence. All of the other evidence and arguments relied upon by the petitioner are directed to undercutting the case the state presented against the petitioner at trial."

The court concluded that the petitioner failed in his burden because it did not find Diaz-Marrero's testimony to be credible and, thus, clear and convincing evidence of his actual innocence. The court, having set forth the reasons why Diaz-Marrero's version of events was not logically persuasive, reiterated that it doubted the veracity of Diaz-Marrero, who, facing lifetime imprisonment as a consequence of his involvement in the crimes at issue, "has absolutely nothing to lose by testifying falsely for the petitioner." The court also observed that Diaz-Marrero testified that he hoped that his testimony in the present proceeding would benefit him in his efforts to obtain a new trial. The court stated: "[N]ot only does he have nothing to lose, but he also hopes to gain personally from now coming forward. Also, unlike many postconviction defendants who take on greater blame and responsibility for the crime, Diaz-Marrero has tried to minimize his role in the killings to something less than what he was convicted of [by claiming that

he was the driver, not a shooter]. "Thus, the fact that Diaz-Marrero's testimony did not expose him to adverse consequences but, in his mind, possibly benefitted him, weighed against a finding that it was truthful.

The court observed that in addition to the fact that Diaz-Marrero did not set forth his version of events until the time of his habeas trial in 2007, when he attempted to obtain a new trial, his testimony was not corroborated by any physical evidence. The court explained: "There is also no physical evidence to corroborate what Diaz-Marrero said. The petitioner, despite calling the 'R' ring a small but important detail, did not produce Wilson Rodriguez to establish that the ring was his and not Alvarado's, as Roman claimed at the criminal trial. Other than Diaz-Marrero's testimony, the petitioner produced no affirmative evidence that in any way linked Caraballo and Roman to the crimes."

The court observed that, to the extent that the petitioner attempted to demonstrate his actual innocence by attempting to undermine the credibility of the witnesses who testified for the state at the criminal trial, his efforts were unpersuasive. The court observed, in part, that the petitioner did not present any affirmative evidence that led it to conclude that any state witness, such as Caraballo, Roman, or Rodriguez, had to have been incorrect in his or her testimony. Moreover, the court stated that the petitioner failed to provide any motive for Aida Bermudez and Romero to testify untruthfully. The court stated: "In the end, for the court to find for the petitioner, it would have to completely disregard the testimony of the state's witnesses, none of whom testified in these proceedings, based principally on the testimony of Diaz-Marrero. This the court cannot do. The evidence presented to the court is loose, equivocal and contradictory. It does not meet the high standard of clear and convincing [evidence]."

After finding that the petitioner failed in his burden of presenting clear and convincing evidence of his actual innocence, the court concluded its analysis as follows: "There is no question that, had Diaz-Marrero testified at the criminal trial as he did before this court, that one or more jurors may have had a reasonable doubt as to the petitioner's guilt. The case against the petitioner was not particularly strong, and counsel has done an admirable job pointing out the weaknesses in the state's case. In fact, this court has some doubt as to the petitioner's guilt in light of some of those weaknesses. Nevertheless, the petitioner stands in a different position today than he did prior to trial. He no longer enjoys the presumption of innocence, and the state no longer bears the burden of proving him guilty beyond a reasonable doubt. The burden is now on the petitioner, and he has failed to meet it.

"To the extent that what Diaz-Marrero testified to is true, then he must live with the knowledge that not

only did he participate in killing two people, his failure to accept responsibility for his actions, when it would have mattered most, has condemned an innocent man to spend the rest of his life in jail. This is not a possible outcome that this court takes lightly. However, the law requires that a petitioner, convicted at a constitutionally sound trial, do more than raise the mere possibility, or even probability, that he is innocent. He must make an extraordinarily high and truly persuasive demonstration, and unquestionably establish his actual innocence with clear and convincing evidence. . . . This, the petitioner has failed to do." (Citation omitted.)

Having set forth the underlying facts and procedural history, we turn to the relevant legal principles and our standard of review. In *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 791–92,[5] which is the touchstone of our analysis, our Supreme Court articulated the standard of proof that a habeas corpus petitioner must satisfy in order to prevail on a freestanding claim of actual innocence: "First, taking into account both the evidence produced in the original criminal trial and the evidence produced in the habeas hearing, the petitioner must persuade the habeas court by clear and convincing evidence, as that standard is properly understood and applied in the context of such a claim, that the petitioner is actually innocent of the crime of which he stands convicted. Second, the petitioner must establish that, after considering all of that evidence and the inferences drawn therefrom, as the habeas court did, no reasonable fact finder would find the petitioner guilty."

In the present appeal, we conclude under *Miller*'s first prong that the petitioner has failed to satisfy his burden of proving his actual innocence with clear and convincing evidence. Accordingly, we need not address whether, under *Miller*'s second prong, the petitioner satisfied his burden of proving that no reasonable fact finder would find him guilty in light of the evidence before the criminal and habeas courts. See, e.g., *Jackson* v. *Commissioner of Correction*, 149 Conn. App. 681, 713–14, 89 A.3d 426 (after concluding that petitioner failed to satisfy his burden of proof under *Miller*'s first prong, unnecessary for reviewing court to undertake analysis under *Miller*'s second prong), cert. granted on other grounds, 313 Conn. 901, 96 A.3d 558 (2014).

With respect to the clear and convincing evidence standard, our Supreme Court stated: "[I]n order to grant a petitioner's request for relief, the habeas court first must be convinced by clear and convincing evidence that the petitioner is actually innocent. The clear and convincing standard of proof is substantially greater than the usual civil standard of a preponderance of the evidence, but less than the highest legal standard of proof beyond a reasonable doubt. It is sustained if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are *highly probably* true,

that the probability that they are true or exist is *substantially greater* than the probability that they are false or do not exist. . . .

"Although we have characterized this standard of proof as a middle tier standard . . . and as an intermediate standard . . . between the ordinary civil standard of a preponderance of the evidence, or more probably than not, and the criminal standard of proof beyond a reasonable doubt, this characterization does not mean that the clear and convincing standard is necessarily to be understood as lying equidistant between the two. Its emphasis on the *high probability* and the *substantial greatness of the probability* of the truth of the facts asserted indicates that it is a very demanding standard and should be understood as such, particularly when applied to a habeas claim of actual innocence, where the stakes are so important for both the petitioner and the state. We have stated that the clear and convincing evidence standard should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory. . . . Thus, we see no functional difference between this standard, properly understood, and the formulations in *Herrera* v. *Collins*, [506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993)], of both the majority—*a truly persuasive demonstration of actual innocence* . . . [id., 420]; and the concurring opinion of Justices O'Connor and Kennedy—extraordinarily high and truly persuasive demonstration[s] of actual innocence. . . . [Id., 426.] Indeed, in *Carriger* v. *Stewart*, 95 F.3d 755, 757 (9th Cir. 1996), the [United States] Court of Appeals [for the Ninth Circuit] equated the *Herrera* standard that the petitioner must unquestionably establish [his] innocence with the clear and convincing evidence standard.

"Moreover, we regard this standard as functionally equivalent to a significant part of the demanding standard imposed by the California Supreme Court in *In re Clark*, [5 Cal. 4th 750, 766, 21 Cal. Rptr. 2d 509, 855 P. 2d 729 (1993)]. If a habeas petitioner has established by clear and convincing evidence that he is actually innocent—that is, if he has made a truly persuasive demonstration of actual innocence—then necessarily he has cast fundamental doubt on the accuracy of and reliability of the [criminal] proceedings. . . . We agree, therefore, with the Texas Court of Criminal Appeals that, at least when applied to a habeas claim of actual innocence, the clear and convincing evidence standard requires an exceedingly persuasive case that [the petitioner] is actually innocent. *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Cr. App. 1996)." (Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 794–96.

Subsequent to *Miller*, our Supreme Court has

explained that "actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime." *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 561, 22 A.3d 1196 (2011). "Affirmative proof of actual innocence is that which might tend to establish that the petitioner *could not* have committed the crime even though it is unknown who committed the crime, that a *third party* committed the crime or that *no* crime actually occurred. . . . Clear and convincing proof of actual innocence does not, however, require the petitioner to establish that his or her guilt is a factual impossibility." (Citations omitted; emphasis in original.) Id., 563–64.

Having discussed the burden of proof that a petitioner must satisfy to prevail in connection with a claim of actual innocence, we turn to our standard of review. With respect to the first component of the petitioner's burden, namely, the court's factual finding with respect to whether actual innocence was proven by clear and convincing evidence, "[t]he appropriate scope of review is whether, after an independent and scrupulous examination of the entire record, we are convinced that the finding of the habeas court . . . is supported by substantial evidence." *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 803. Our Supreme Court has explained that this standard of review is appropriate in light of "the essentially factual nature of the habeas court's task in making that determination," which typically is based on the court's assessments of the credibility of witnesses, as well as "the importance of the factual determination at stake, to the interests of the parties, and to the extraordinary nature of the ultimate remedy in the event that the petitioner is successful." Id., 804. In contrast, the plenary standard of review applies to the issue of whether the petitioner has satisfied the second component of his burden under the *Miller* test, namely, that no reasonable fact finder would find him guilty. Id., 805.

Turning to the present case, it is not in dispute that the petitioner presented evidence in the form of Diaz-Marrero's testimony to demonstrate that he did not have any involvement in the murders of the victims; that Diaz-Marrero, rather than the petitioner, was the driver of the van; and that Caraballo and Roman shot the victims. Thus, the evidence at issue was submitted as proof that third parties committed the crimes.

As set forth previously in this opinion, the habeas court went into great detail to explain why it did not view Diaz-Marrero's testimony to be clear and convincing evidence that third parties committed the crimes. The court analyzed Diaz-Marrero's testimony in great depth and, in its fact-finding role, unambiguously found Diaz-Marrero not to have been a credible witness. The court's credibility determination reflected a mosaic of concerns. The court found, among other things, that it

was left with significant concerns about Diaz-Marrero's veracity in that his testimony appeared to be self-serving and part of an overall effort to minimize his role in the murders. The court found that Diaz-Marrero's testimony was not logically persuasive in that it left many questions related to the commission of the crimes unanswered. The court found that Diaz-Marrero's testimony, which obviously conflicted with the testimony of other eyewitnesses to the crimes, was not corroborated by any physical evidence. Evidence of such character certainly does not satisfy the demanding standard of proof that applies to claims of actual innocence, which "forbids relief whenever the evidence [of actual innocence] is loose, equivocal or contradictory." (Internal quotation marks omitted.) Id., 795.

Before this court, the petitioner's position unquestionably relies upon a determination by this court that the habeas court erred in its negative assessment of Diaz-Marrero's testimony. He argues that before the habeas court he presented "clear affirmative evidence of his innocence" and thereby appears to invite this court to reevaluate Diaz-Marrero's credibility. This we cannot do. We are instructed to review the habeas court's ultimate finding, namely, that the petitioner failed to demonstrate his actual innocence, by determining whether such ultimate finding is supported by substantial evidence. Id., 806. In rejecting the application of a more stringent standard of review, our Supreme Court recognized that many of the determinations that the habeas court must make in reaching that ultimate finding are of "[an] essentially factual nature." Id., 804. It is simply not possible for a reviewing court to wholly reevaluate findings that pertain to witness credibility because a reviewing court lacks the ability to observe firsthand the demeanor of witnesses. As this court has often explained: "As an appellate court, we do not reevaluate the credibility of testimony . . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous . . . . This court does not retry the case or evaluate the credibility of witnesses. Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *Coward* v. *Commissioner of Correction*, 143 Conn. App. 789, 803, 70 A.3d 1152, cert. denied, 310 Conn. 905, 75 A.3d 32 (2013).

In several prior decisions, this court has declined to disturb credibility determinations made by habeas courts, and has affirmed the denial of actual innocence claims when they have been based, at least in part, on testimony that the habeas court found to be not credible. See, e.g., *Jackson* v. *Commissioner of Correction*,

supra, 149 Conn. App. 711; *Corbett* v. *Commissioner of Correction*, 133 Conn. App. 310, 316–17, 34 A.3d 1046 (2012); *Vasquez* v. *Commissioner of Correction*, 128 Conn. App. 425, 446, 17 A.3d 1089, cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011); *Charlton* v. *Commissioner of Correction*, 51 Conn. App. 87, 90, 719 A.2d 1205 (1998), cert. denied, 247 Conn. 961, 723 A.2d 815 (1999).

On the basis of our review of the evidence before the habeas court, we conclude that its assessment of the weaknesses in Diaz-Marrero's testimony, made following its firsthand observations of such testimony, was supported by the evidence.[6] Affording, to the extent possible, a more stringent review with respect to the underlying issue of credibility, we are left to conclude that there is nothing in the record that convinces us that Diaz-Marrero's testimony was "highly probably true or that the probability that the testimony is true is substantially greater than the probability that it is false." (Internal quotation marks omitted.) *Charlton* v. *Commissioner of Correction*, supra, 51 Conn. App. 91.

Alternatively, the petitioner argues that "the habeas court seemed to credit the essential portions of Diaz-Marrero's testimony," yet improperly failed to conclude that such testimony was clear and convincing evidence of his actual innocence. In this vein, the petitioner argues that the court's decision essentially was internally inconsistent because, on one hand, it concluded that Diaz-Marrero's testimony was not clear and convincing evidence of his actual innocence and, on the other hand, it observed that such testimony, if presented at the time of the petitioner's criminal trial, may have changed the outcome of the trial.[7] The petitioner also relies on the court's statement that certain arguments raised by the petitioner caused it to doubt his guilt, as well as the court's characterization of the state's case against the petitioner as "weak."

What the petitioner views as an internal inconsistency in the habeas court's decision merely reflects the court's proper understanding and allocation of the petitioner's burden of proof in connection with his claim of actual innocence. The petitioner's argument rests upon the flawed premise that evidence that might have given rise to reasonable doubt in the mind of the finder of fact, or which might have tended to undermine the state's case at the time of the criminal trial, necessarily is equivalent to clear and convincing evidence that he did not commit a crime, that a third party committed the crime, or that no crime actually occurred. See *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 563. It should be clear from the relevant precedent set forth previously in this opinion that such a position is legally inaccurate. Thus, the fact that the habeas court opined that Diaz-Marrero's testimony likely would have changed the outcome of his criminal trial does not in any way call into question the correctness of its finding

that the petitioner failed to present clear and convincing evidence of his actual innocence. Additionally, it was not inconsistent for the court, in its fact-finding role, to discredit Diaz-Marrero's testimony while also opining that the testimony was of such a nature that it was possible for a different fact finder, namely, the jury at the petitioner's criminal trial, to have found it to be credible evidence tending to exonerate the petitioner.

As the habeas court observed, the petitioner was convicted of the crimes at issue in a constitutionally sound proceeding; his judgment of conviction was affirmed by our Supreme Court. The petitioner's habeas corpus petition did not afford him a second opportunity to challenge the sufficiency of the evidence presented by the state at his criminal trial. The petitioner is no longer entitled to a presumption of innocence, and any perceived weaknesses in the state's case, whether expressed by him or by the habeas court, are not germane to the issue of whether, under *Miller*'s first prong, the petitioner has presented clear and convincing evidence of actual innocence. "Discrediting the evidence on which the conviction rested does not revive the *presumption* of innocence. To disturb a long settled and properly obtained judgment of conviction, and thus put the state to the task of reproving its case many years later . . . petitioners must affirmatively demonstrate that they are *in fact* innocent." (Emphasis in original.) *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 567.

On the basis of independent and scrupulous review of the entire record of this case, we conclude that substantial evidence supports the finding by the habeas court that the petitioner failed to establish by clear and convincing evidence that he is actually innocent of the crimes of which he stands convicted.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The habeas court noted: "The court understands that it would have been exceedingly difficult, and in some cases impossible, for the petitioner to produce much of this evidence. Nevertheless, it is the petitioner's burden to prove his innocence by clear and convincing evidence."

[2] The habeas court concluded: "The petitioner argues that the statement to Romero could be misunderstood as the petitioner being worried about being implicated in Alvarado's drug business, not the murder. The problem is that the petitioner did not testify that his words were misunderstood. He testified that he never said them. Thus, there is no evidence to support this argument."

[3] "[O]ur Supreme Court has deemed the issue of whether a habeas petitioner must support his claim of actual innocence with newly discovered evidence an open question in our habeas jurisprudence. . . . This court, nevertheless, has held that a claim of actual innocence must be based on newly discovered evidence. . . . [A] writ of habeas corpus cannot issue unless the petitioner first demonstrates that the evidence put forth in support of his claim of actual innocence is newly discovered. . . . This evidentiary burden is satisfied if a petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence could not have been discovered prior to the petitioner's criminal trial by the exercise of due diligence." (Citation omitted; internal quotation marks omitted.) *Gaston* v. *Commissioner of Correction*, 125 Conn. App. 553, 558–59, 9 A.3d 397 (2010), cert.

denied, 300 Conn. 908, 12 A.3d 1003 (2011).

[4] Before this court, the respondent, while not conceding the propriety of the court's conclusion that Diaz-Marrero's testimony was newly discovered evidence, does not challenge the court's decision in this regard. The respondent observes that "the record contains no indication that, at the time of the criminal trial, Diaz-Marrero had ever made a statement to the petitioner, or to anyone for that matter, implicating himself in the crimes and/or exonerating the petitioner, such that the petitioner knew or should have known that Diaz-Marrero possessed information showing that the petitioner was actually innocent." Because we conclude that the court's determination, that Diaz-Marrero's testimony was not clear and convincing evidence of the petitioner's actual innocence, was supported by substantial evidence, we need not determine whether the court properly considered the testimony to be newly discovered evidence.

[5] We interpret some of the arguments advanced by the petitioner in the present appeal as an invitation for this court to question the burden of proof that our Supreme Court carefully articulated in *Miller*. As an intermediate court of appeal, we decline to overrule, reevaluate or reexamine the precedent of our Supreme Court. See, e.g., *Stuart* v. *Stuart*, 297 Conn. 26, 45–46, 996 A.2d 259 (2010).

[6] With respect to the court's observation that Diaz-Marrero had acknowledged during his testimony that he hoped his testimony would benefit him in some way, we refer to the respondent's cross-examination of Diaz-Marrero, during which the following colloquy occurred:

"Q. Now, according to your testimony today, you did not shoot Mr. Caraballo?

"A. No.

"Q. You did not shoot Migdalia Bermudez?

"A. No.

"Q. Now, Roman Caraballo, he testified against you at your criminal trial. Correct?

"A. Yes.

"Q. And Jesus Roman, I think he testified against you, correct?

"A. Yes.

"Q. And Maria Cruz Rodriguez, she testified against you?

"A. Yes.

"Q. So today you're saying that they were all wrong?

"A. Yes.

"Q. Now . . . you have filed three habeas petitions, correct?

"A. Yes. . . .

"Q. You want a new trial. Right?

"A. Yes.

"Q. Now, do you think if you can show that the state's witnesses lied, you can get a new trial?

"A. Yes."

Later, Diaz-Marrero testified that he intended to continue to pursue habeas corpus relief in the form of a new trial.

As we have explained previously in this opinion, Diaz-Marrero testified that he, not the petitioner, was the driver of the van connected with the crimes at issue in the present appeal. With respect to the habeas court's observation that Diaz-Marrero did not set forth this version of the events surrounding the victims' murders until his habeas trial in 2007, we observe that Diaz-Marrero's criminal trial attorneys, Butler and Zeldis, were consistent in their testimony that, at the time of the criminal trial, Diaz-Marrero represented to them that he did not have any involvement in the crimes.

[7] The petitioner suggests that the court's memorandum of decision is "loaded with cognitive dissonance."